## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| **HOWARD CROSBY JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | |
| | ) | |
| **LLOYD AUSTIN, III, in his official** | ) | NO. 8:21-CV-02730-TPB-CPT |
| **capacity as Secretary of Defense,** | ) | |
| **U.S. Department of Defense, and** | ) | **FIRST AMENDED** |
| | ) | **COMPLAINT FOR** |
| **CHRISTINE WORMUTH, in her** | ) | **DECLARATORY AND** |
| **official capacity as Secretary of** | ) | **INJUNCTIVE RELIEF** |
| **the Army, Department of the** | ) | |
| **Army,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

1.    Plaintiff Howard Crosby Jr. is a highly decorated Sergeant Major ("SGM") in the US Army Reserves with over 24 years of experience and multiple combat deployments. SGM Crosby challenges the lawfulness of the August 24, 2021 Department of Defense ("DoD") COVID-19 vaccine mandate, *see* ECF 1-2 ("DoD Mandate"), because the DoD Mandate and the Army's execution of Secretary Austin's order violates the federal statutes requiring informed consent for treatments subject to an emergency use authorization ("EUA"), *see* 10 U.S.C. § 1107a and 21 U.S.C. § 360bbb-3, is an *ultra vires* action exceeding the Secretary's statutory authority, and is arbitrary,

1

capricious and otherwise contrary law in violation of the Administrative Procedure Act ("APA"). 5 U.S.C. § 551 *et seq.* SGM Crosby also challenges the constitutionality and lawfulness of Defendants' policy of uniformly denying religious exemption requests because Defendants' policy violates the right to free exercise of religion protected by the First Amendment to the U.S. Constitution and the Religious Freedom Restoration Act ("RFRA"). U.S. CONST. AMEND. I & 42 U.S.C. § 2000bbb, *et seq*.

2.      The DoD Mandate, issued one day after the Food and Drug Administration's ("FDA") August 23, 2021 licensure of the Pfizer/BioNTech Comirnaty vaccine, *see generally* ECF 1-3 ("FDA Comirnaty Approval Letter"), requires 100% of service members to be "fully vaccinated" with a fully FDA-licensed vaccine labeled in accordance with FDA requirements. *See* ECF 1-2 at 1. The DoD Mandate also categorically eliminates the pre-existing exemption under Army Regulation 40-562, *see* ECF 1-6, for service members like Plaintiff who have natural immunity from a previous documented infection. ECF 1-2 at 1.

3.      Subsequently issued orders implementing the DoD Mandate across the DoD and Army, *see, e.g.,* ECF 1-11 ("DoD Surgeon Generals Memo") & ECF 1-8 ("FRAGO 5"), violate the express terms of the DoD Mandate (which permits only FDA-licensed vaccines labeled in accordance with the FDA

labeling requirements to be mandated) and Informed Consent Laws insofar as the DoD and the Army have mandated administration of unlicensed, EUA vaccines because the licensed vaccines, Pfizer/BioNTech's Comirnaty and Moderna's Spikevax vaccines, were not and are not available. The DoD Mandate and the Army execution orders also violate the APA, 5 U.S.C. § 706(2)(A), insofar as the DoD Mandate and/or Army orders constitute an unexplained and unannounced departure from previous policies, rules and regulations; refuse to consider any alternatives to 100% vaccination; and fail altogether to consider the protection provided by natural immunity or the serious health risks posed to service members like the Plaintiff who have recovered from a recent COVID-19 infection.

4.     Plaintiff has a fundamental right to religious free exercise free of coercion, and to participate in the military without discrimination on the basis of religion.  Defendants are systematically denying religious accommodations in violation of the Free Exercise Clause of the First Amendment and RFRA. Defendants intend to force Plaintiff, like tens of thousands of other service members, to choose between his sincerely held religious beliefs, which requires him to refuse the currently available COVID-19 vaccines, or else face discipline and discharge. The Defendants' actions prove the unlawful and exclusionary

intent: zero or near zero religious accommodation requests have been granted, while thousands have been denied. *See supra* Section IV.

5.    Plaintiff files this action seeking declaratory relief and injunctive relief consistent with that granted in this District in *Navy SEAL 1 v. Austin*, No. 8:21-cv-2429-SDM-TGW ("*Navy SEAL 1* Proceeding"):

(1) Declare the DoD Mandate and other implementing orders to be unlawful, *ultra vires* actions, and to vacate these orders to the extent that these orders mandate administration of an unlicensed EUA vaccine;

(2) Enjoin the implementation or enforcement of the DoD Mandate by the Defendants with respect to Plaintiff;

(3) Declare that the Defendants' religious exemption process and policies violate service members' rights under RFRA and the First Amendment Free Exercise Clause; and

(4) Enjoin any adverse or retaliatory action against the Plaintiff as a result of, arising from, or in conjunction with the Plaintiff's RAR requests or denials, or for pursuing this action, or any other action for relief from Defendants' constitutional, statutory, or regulatory violations.

6.    Plaintiff seeks this relief pursuant to the APA, 5 U.S.C. §§ 702 and 705; the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and the All Writs Act, 28 U.S.C. § 1651.

## **PARTIES**

7.    Plaintiff SGM Crosby has served in the US Army Reserves for over 24 years as a Chaplain's Assistant and now as a Religious Affairs Non-Commissioned Officer. SGM Crosby has been awarded the U.S. Central

Command star performer award from General (now Secretary of Defense) Austin, Defense Meritorious Service Medal, Joint Commendation Medal, Army Commendation Medal, and the Joint Service Achievement Medal.

8.    SGM Crosby is domiciled in Brandon, Hillsborough County, Florida, and his duty station for drilling is in Texas. Because he is a Drilling Individual Mobilization Augmentee ("DIMA") component, he is considered to be on active-duty and is subject to active-duty requirements, including the deadlines for vaccination (December 15, 2021).

9.    SGM Crosby has declined to take an unlicensed EUA Pfizer/BioNTech vaccines, because such an order is unlawful and inconsistent with the express terms of the DoD Mandate. *See* Ex. 1, Crosby Decl., ¶ 8. On three separate occasions in November 2021 and January 2022, SGM CROSBY inquired regarding the availability of FDA-licensed Comirnaty and/or BLA-compliant lots from military healthcare providers at Fort Sill, Oklahoma and MacDill Air Force Base ("AFB"), Florida. *See id.*, ¶ 6. Comirnaty was not available at either facility on any of these dates. *Id.* On November 17, 2021, MacDill AFB personnel stated that they had EUA-labeled Pfizer/BioNTech vaccines from what they claimed was a BLA-compliant lot, but the lot was manufactured before the August 23, 2021 FDA licensure date, *see id.*, and thus could not have even been BLA compliant vaccines. *See Doe #1-#14 v. Austin*, -

-- F.Supp.3d ---, 2021 WL 5816632, at *6 (N.D. Fla. Nov. 12, 2021) ("*Austin*") ("FDA licensure does not retroactively apply to vials shipped before BLA approval."). Following the February 11, 2022 hearing before this Court, SGM Crosby inquired whether Defendants had the FDA-licensed Comirnaty, labeled as such, but Defendants were not able to provide the FDA-licensed and labeled vaccine.

10.    On October 25, 2021, SGM Crosby received guidance from a DoD official further supporting his position regarding the lawfulness of an order to take an EUA vaccine. First, the official confirmed that fully FDA-licensed vaccines labeled in accordance with FDA requirements, as required by the DoD Mandate, were not and would not be available. *See* Ex. 1, Crosby Decl., ¶ 11 (*quoting* Attach. 3, October 25, 2021 email from COL Richard Malish) ("Pfizer won't start distributing the BLA-labeled drug until all the EUA drug is off the shelf"). Second, the official confirmed  that the EUA version cannot be mandated. *See id.* ("Drugs under an EUA cannot be mandated for Service Members without an exemption from POTUS.").

11.    Despite the fact that at that time SGM Crosby had not declined immunization with an FDA-licensed Comirnaty vaccine, on October 12, 2021, he received counseling from his commanding officer for vaccine refusal. Subsequently, he has been unlawfully pressured to sign counseling statements

and he has been threatened with a letter of reprimand, receiving a less than honorable discharge, and loss of retirement and veterans benefits to which he is entitled. He has not been on duty at ARNORTH since June 2021.

12.    On March 2, 2022, SGM Crosby had a positive antigen test for COVID-19, and he followed up with a positive PCR test for COVID-19 on March 3, 2022. He fully recovered of any symptoms within less than 24 hours after the first signs of symptoms, and even went for a jog on the same day (March 3).

13.    On November 14, 2021, SGM Crosby submitted his initial request for religious accommodation ("RAR") based on his sincerely held religious objections to the COVID-19 vaccines. *See* Ex. 1, Crosby Decl., Attach. 4. As of May 4, 2022, he has not received any decision on his request nearly six months later, despite the fact that the Army is required to act on such requests within 95 days. *See* Ex. 2, DoD Instruction 1300.17 ("DODI 1300.17"), *Religious Liberty in the Military Services* (Sept. 10, 2021) at 10 & Table 1.

14.    Defendant DoD is a Department of the United States Government. It is led by the Secretary of Defense, Lloyd J. Austin, III, who issued the DoD Vaccine Mandate.

15.    Defendant Department of the Army is a Department of the United States Government. It is led by the Secretary of the Army Christine Wormuth.

## JURISDICTION AND VENUE

16.    This case arises under federal law, namely the First Amendment of the United States Constitution, U.S. CONST. AMEND. I; the APA, 5 U.S.C. § 551, *et. seq.*; 10 U.S.C. § 1107a; 21 U.SC. § 360bbb-3; the RFRA, 42 U.S.C. § 2000bb-1, *et seq.*; and AR 40-562.

17.    The DoD Mandate and Army executing orders like FRAGO 5 are final agency actions for which there is no other adequate remedy in a court. 5 U.S.C. § 704. These actions mark the consummation of the agency's decision-making process with respect to the DoD's imposition of a vaccine mandate.

18.    Jurisdiction is proper in this Court under the Administrative Procedures Act, 5 U.S.C. § 702, and under 28 U.S.C. § 2201, which states that actions involving controversies with federal agencies may be pursued in any United States District Court, and under 28 U.S.C. §§ 1331 and 1346.

19.    Jurisdiction for the RFRA claim is also proper in this Court. 42 U.S.C. § 2000bb-1(c) expressly creates a remedy in district court, and RFRA does not include any requirement to first exhaust administrative remedies.

20.    Venue is proper in this Court pursuant to 28 U.S.C. § 1402 and 28 U.S.C. § 1391(e) because Plaintiff is domiciled in this district, and because a substantial part of the act or omissions giving rise to the claim, have or will occur in this district, unless this Court grants the relief requested herein.

## STATEMENT OF FACTS

### I.   THE DOD MANDATE AND ARMY GUIDANCE

#### A.   DoD Mandate and Guidance

21.   On August 24, 2021, Defendant Secretary Austin issued the DOD Mandate in the form of a two-page memorandum ("SECDEF Memo"), *see* ECF 1-2, directing the Secretaries of the Military Departments "to immediately begin full vaccination of all members of the Armed Forces … who are not fully vaccinated against COVID-19." *Id.* at 1. The Secretary further directed that mandatory vaccination "will only use COVID-19 vaccines that receive full licensure from the [FDA], in accordance with FDA labeling and guidance," and that vaccination requirements are "to be implemented consistent with DoD Instruction 6205.02." *Id.* The SECDEF Memo does not cite any statute, regulation, executive order, or any other legal basis for the DoD's authority to issue the mandate.

22.   The only service members expressly exempted are those "actively participating" in vaccine trials. *Id.* "Those with previous COVID-19 infection are not considered fully vaccinated," *id.*, nor are they provided a medical exemption. The SECDEF Memo does not mention AR 40-562, the medical exemptions provided thereunder, or the legal basis for SECDEF's action; nor is there any suggestion that the SECDEF Memo repeals, modifies, or waives AR 40-562 or any other currently effective rule, regulation, or instruction.

9

23.     On September 14, 2021, Assistant Secretary of Defense for Health Affairs Terry Adirim directed Armed Services Surgeons General and DoD components that "health care providers ***should*** use doses distributed under the EUA to administer the vaccination as if the doses were the licensed [Comirnaty] vaccine." ECF 1-11, DoD Surgeons General Memo, at 1 (emphasis added).

### B.     Army Guidance and Implementation

24.     All active-duty Army personnel are required to be fully vaccinated by December 15, 2021. *See* ECF 1-8, Army FRAGO 5, ¶ 3.D.14. The Army Guidance states that "service members with previous infections or positive serology are not automatically exempt," ¶ 3.D.8.B.6, and the Army has indicated that it will not grant, or even consider, requests for exemptions based on previous documented infection. Army rules and procedures for religious accommodation requests are set forth in DODI 1300.17 and Army Regulation 600-20, "Army Command Policy" (July 24, 2020) ("AR 600-20"). Based on the information submitted by the Army in a related court proceeding, the Army has received thousands of religious accommodation requests, denied hundreds, but not granted any. *See infra* Section IV.B, Table 1.

### C.     DoD and Army Administrative Records

25.     Defendants produced the complete, certified administrative record for the DoD Mandate and the Army's implementing orders and guidance in

*Coker v. Austin*, No. 3:21-cv-1211-AW-HTC (N.D. Fla.) ("*Coker* Proceeding"), and Plaintiff will file these administrative records with this Court under separate cover due to the large size of the files. Review of the DoD and Army records confirms that, contrary to Defendants' counsels' assertions in this proceeding, *see, e.g.,* ECF 15 at 22-24, the DoD Mandate and the scope of interchangeability are not limited to the subset of EUA-labeled, "BLA-compliant" lots. Instead, all EUA-labeled Pfizer/BioNTech and Moderna COVID-19 vaccines are treated as interchangeable with all of that manufacturers FDA-licensed COVID-19 vaccines, and thus any and all of their EUA-labeled COVID-19 vaccines may be mandated. There is no discussion of interchangeability with respect to "BLA-compliant" lots, nor is there any policy, directive, or guidance limiting the DoD Mandate to EUA-labeled, "BLA-compliant" lots. *See generally* Ex. 3 (graphic outlining procedures required for DoD to implement a vaccine mandate limited to EUA-labeled, BLA-compliant vaccines).

### D.   Disciplinary Actions for Vaccine Refusal

26.   The Army Guidance states that the requirement to be vaccinated is a "lawful order" and that any service members who refuses to take the vaccine will be subject to the full range of administrative and disciplinary actions under the UCMJ. *See* ECF 1-8, FRAGO 5, ¶ 3.D.8.B & Annex 20. Under the UCMJ, a service member who disobeys "any lawful general order or

11

regulation," UCMJ § 892(2), Art. 92(2), faces sanctions up to a court-martial. UCMJ § 892. This punishment may include "dishonorable discharge, forfeiture of all pay and allowances, and confinement for 2 years." *Id.* Section 736 of FY 2022 National Defense Authorization Act ("FY2022 NDAA") provides that service members separated solely as a result of noncompliance with the DoD Mandate may receive no worse than a general discharge. FY2022 NDAA, § 736, P.L. 117-81.

## II.   FDA EMERGENCY USE AUTHORIZATION AND LICENSING OF COVID-19 TREATMENTS

### A.   FDA Emergency Use Authorization for COVID-19 Vaccines

27.    The Food, Drug and Cosmetic Act ("FDCA") authorizes the FDA to issue an EUA for a medical drug, device, or biologic, where certain conditions have been met. The conditions include a declaration by the Secretary of Health and Human Services of a public health emergency that justifies the use of an EUA, 21 U.S.C. § 360bbb-3(b)(1), and a finding by the FDA that "there is no [1] adequate, [2] approved, and [3] available alternative to the product for diagnosing, preventing, or treating" the disease in question. 21 U.S.C. § 360bbb-3(c)(3).

28.    There are significant differences between licensed vaccines and those subject to EUA that render them "legally distinct." ECF 1-5, August 23, 2021 Pfizer/BioNTech EUA Re-Issuance Letter, at 2 n.8. First, the

requirements for efficacy are much lower for EUA products than for licensed products. In particular, rather than requiring an applicant to prove that a vaccine is safe and effective (or potent) based on well-controlled clinical trials, mere speculation is sufficient to grant an EUA. EUAs require only a showing that, based on scientific evidence "if available," "it is reasonable to believe," the product "may be effective" in treating or preventing the disease. 21 U.S.C. §360bbb-3(c)(2)(A). Second, the safety requirements are minimal, requiring only that the FDA conclude that the "known and potential benefits ... outweigh the known and potential risks" of the product, considering the risks of the disease. 21 U.S.C. §360bbb-3(c)(2)(B). Third, EUA products are exempt from certain manufacturing and marketing standards, enjoy broader product liability protections, and cannot be mandated due to informed consent laws and regulations.

### B.    Informed Consent Requirements for EUA Products

29.    The FDA's grant of an EUA is subject to informed consent requirements to "ensure that individuals to whom the product is administered are informed" that they have "the option to accept or refuse administration of the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III). For the COVID-19 vaccines, FDA implemented the "option to accept or refuse" condition in each letter granting the EUA by requiring that FDA's "Fact Sheet for Recipients and Caregivers" be made available to every potential vaccine recipient. Each Fact

Sheet must inform the recipient of their statutory right to informed consent, expressly stating that the recipient "has the option to accept or refuse" the vaccine. *See, e.g.,* ECF 1-13, FDA, "Fact Sheet for Health Care Providers Administering Vaccine (Vaccination Providers)," at 9 (Aug. 23, 2021).

### C.    FDA Vaccine Licensing and Approval

30.    The FDCA generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" unless and until the FDA has approved the drug or biological product as safe and effective for its intended use. 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C. § 262(a). Pursuant to Section 351(a) of the PHSA, 42 U.S.C. § 262(a), the FDA has the authority to approve the sale and manufacture of vaccines and other biologics like the Comirnaty and Spikevax vaccines. The biologics application addresses not only the safety and efficacy of the product, but also covers specific labeling and manufacturing requirements, including the manufacturing location, process, and storage requirements.

31.    The PHSA expressly prohibits the sale of any biologic product in interstate commerce unless the package is "plainly marked with" "the proper name of the biological product," (*e.g.,* Comirnaty or Spikevax) and "the name, address and applicable license number of the manufacturer." 42 U.S.C. § 262(a)(1)(B)(i)-(ii). These requirements are mandatory, not discretionary. *See* 21 C.F.R. § 610.60(a)(1)(2) (directing that the "proper name" and "license

14

number" "shall appear on the label" of biological product); *see also* 21 C.F.R.

§ 207.37(a)(2) (a product is "deemed … misbranded" if labeling codes used to

"denote or imply FDA approval of [an unapproved] drug"). EUA products, by

contrast, must be marked as such, and cannot include the license number.

### D.     Comirnaty Approval and EUA Re-Issuances

32.    On August 23, 2021, the FDA approved the May 18, 2021,

Comirnaty application for individuals 16 years or older. The Comirnaty

Approval Letter approves the sale of Comirnaty Vaccine, as well as the specific

manufacturing facilities, processes, ingredients, storage, and distribution

requirements that were not addressed in the EUA reissuances.

33.    Also on August 23, 2021, the FDA re-issued the EUA for the

Pfizer/BioNTech Vaccine for individuals 16 years or older and for children aged

12 to 15 years. The FDA extended and expanded the existing EUA because

Comirnaty was not available. *See* ECF 1-5, August 23, 2021 Pfizer/BioNTech

EUA Reissuance at 5 n.9. In subsequent EUA re-issuances, the FDA has stated

that the multiple, distinct formulations of the licensed and EUA vaccines may

be used interchangeably because they are "analytically comparable." *See, e.g.,*

FDA, Mar. 29, 2022 EUA Re-Issuance Letter, at 13-14, *available at*:

https://www.fda.gov/media/150386/download (last visited May 2, 2022).

34.    On September 13, 2021, the National Institutes of Health ("NIH")

posted an announcement by Pfizer that Pfizer "does not plan to produce any

product with these new [Comirnaty] NDCs and labels over the next few months while the EUA authorized product is still available and being made available for U.S. distribution." *See* ECF 1-22, NIH-Pfizer Announcement of Comirnaty Unavailability. The FDA has subsequently confirmed that Comirnaty remains unavailable in the United States. *See, e.g.,* ECF 1-24, Nov. 8, 2021 Comirnaty Summary Basis of Regulatory Action at 5 ("November 8 Comirnaty SBRA"); March 29, 2021 Pfizer/BioNTech EUA Reissuance at 10. Plaintiff has also repeatedly confirmed it has not been available since the inception of the mandate through the present. *See* Ex. 1, Crosby Decl., ¶ 6.

### E.    Spikevax Approval and EUA Re-Issuance

35.    On January 31, 2022, the FDA approved Moderna's BLA for Spikevax. Also on the same date, the FDA re-issued the EUA for the Moderna COVID-19 vaccine, once again asserting that the "legally distinct" EUA and licensed versions "can be used interchangeably" because they have the "same formulation." FDA, Mar. 29, 2022 Moderna EUA Re-Issuance, at 11, *available at*: https://www.fda.gov/media/144636/download (last visited May 2, 2022). And once again, as with Comirnaty, the FDA noted that "there is not sufficient approved vaccine available" for the eligible population. *Id.* at 8 n.13.

### F.    Legal Differences Between EUA and Licensed Vaccines

36.    Defendants assert that licensed and EUA vaccines are legally interchangeable for the purposes of the DOD Mandate, *i.e.*, that EUA vaccines

16

may be legally mandated, notwithstanding the express prohibition in 10 U.S.C. § 1107a.

37.    The FDA has never asserted that the EUA and licensed versions are legally interchangeable. The FDA's EUA reissuance letters have consistently acknowledged that the two vaccines are "legally distinct." *See, e.g.,* ECF 1-5 at 2 n.8. The FDA's witness in this proceeding confirmed that the FDA has not made any "statutory interchangeability determination" and instead described the products as only "medically interchangeable." ECF 15-14, Marks Decl., ¶¶ 10-11. This simply means that one dose of an EUA vaccine and one dose of a licensed vaccine may be used to administer a two-dose vaccine regimen. *See, e.g.,* Ex. 4, Congressional Research Service, *FDA Approval of the Pfizer-BioNTech COVID-19 Vaccine: Frequently Asked Questions* at 5 (Updated Sept. 29, 2021) ("CRS Report").

38.    The EUA is a "distinct regulatory pathway" under 21 U.S.C. § 360bbb-3 from FDA licensing under the PHSA. CRS Report at 1. For FDA licensure under the PHSA, the applicant must satisfy the distinct and higher statutory requirements regarding safety, purity, and potency (or effectiveness), as well as distinct requirements for FDA approval of biologics manufacturing and labeling that are not required for EUA products. Accordingly, even if the EUA and licensed product had the "same formulation" – and as discussed

below there is evidence in the record that they do not – the EUA version "is legally distinct and can be manufactured, marketed, distributed and **administered only pursuant to the EUA**." CRS Report at 5 (emphasis added). One of these key "legal distinctions" is that an FDA-approved vaccine may be mandated, while an EUA vaccine may not be without Presidential authorization, which Defendant Austin has neither requested nor received.

39.    The publicly available information available indicates that there are differences in the composition of the EUA and licensed products. *See, e.g., Austin*, 2021 WL 5816632, at *3 n.5. There is also no dispute that the FDA EUA did not address manufacturing processes or locations, which are solely addressed in the Comirnaty licensure. *See* ECF 1-4, Aug. 23, 2021 Comirnaty SBRA, at 12-13. In any case, the FDA documents severely understate the complexities of the novel mRNA vaccines and nanolipid delivery systems, which Pfizer has stated include "more than 280 materials," rather than 10 or 11 disclosed in FDA filings, "made by suppliers in 19 countries." Stephanie Baker & Vernon Silver, *Pfizer Fights to Control Secret of $36 Billion Covid Vaccine Recipe*, Bloomberg (Nov. 14, 2021), available at: https://www.bloomberg.com/graphics/2021-pfizer-secret-to-whats-in-the-covid-vaccine/ (last visited May 2, 2022).

## III.   SAFETY AND EFFICACY FOR PFIZER/BIONTECH AND MODERNA COVID-19 VACCINES

### A.   Pfizer/BioNTech Safety & Efficacy Data Reviewed by FDA

40.     The Pfizer-BioNTech and Moderna COVID-19 treatments employ novel technology, namely, mRNA delivered by nanolipids. These products are considered "genetic vaccines" or "or vaccines produced from gene therapy molecular platforms."  ECF 1-14, McCullough Decl., ¶ 17. As Dr. McCullough explains, the mRNA "vaccines" "have a dangerous mechanism of action in that they all cause the body to make an uncontrolled quantity of the pathogenic wild-type spike protein from the SARS-CoV-2 …. This is *unlike all other vaccines* where there is a set amount of antigen or live-attenuated virus." *Id.* (emphasis added).

### B.   COVID-19 Vaccines Do Not Prevent Spread of Omicron.

41.     None of the COVID-19 vaccines has "demonstrated in a conclusive, randomized, placebo-controlled trial" that they "reduce the risk of Omicron infection or any of its complications." Ex. 5, McCullough Supp. Decl., ¶ 8. Further, "COVID-19 vaccinations do not impede the changes that a person will transmit the [Omicron variant] to another person." *Id.*, ¶ 9. This is because the spike protein produced by the vaccines, which was developed using the original Alpha variant, has long since become "obsolete" with the emergence of the

Delta variant and Omicron variants. *See* ECF 1-14, McCullough Decl., ¶ 18 (Delta variant); *see also* Ex. 5, McCullough Supp. Decl., ¶ 10 (Omicron variant).

### C. Vaccine Injuries and Side Effects

42. The VAERS data reveal unprecedented levels of death and other adverse events since the FDA issued EUAs for the three COVID vaccines. The total safety reports in VAERS for all vaccines per year up to 2019 was 16,320. By comparison, the total VAERS safety reports for COVID-19 Vaccines "alone through October 1, 2021, is 778,683." ECF 1-14, McCullough Decl., ¶ 27. Through April 2022, COVID-19 vaccination "has led to more than 12,000 deaths and more than 13,000 permanently disabled Americans." Ex. 5, McCullough Supp. Decl., ¶ 17.

43. The COVID-19 vaccines pose a particular risk of myocarditis (heart inflammation) to those who are in the prime ages for military service. ECF 1-14, McCullough Decl., ¶ 30. Due to these risks, in Dr. McCullough's expert medical opinion, "no individual under age 30 under any set of circumstances should feel obliged to take this risk with the current genetic vaccines particularly the Pfizer and Moderna products." *Id.*, ¶ 32. *See also* Ex. 5, McCullough Supp. Decl., ¶ 12 (discussing FDA myocarditis warnings).

**D.      Superiority of Natural Immunity to Vaccination and Risks of Vaccination to Those with Naturally Immunity.**

44.     Numerous studies demonstrate the superiority of natural immunity over vaccine-induced immunity. *See generally* ECF 1-14, McCullough Decl., ¶¶ 52-57 & studies cited therein. In Dr. McCullough's expert opinion, "SARS-CoV-2 causes an infection in humans that results in robust, complete, and durable immunity, and is superior to vaccine immunity." *Id.*, ¶ 53. Further, "there are no randomized placebo-controlled … trials of COVID-19 vaccination … demonstrating any clinical benefit" for those who have recovered from a previous infection. Ex. 5, McCullough Supp. Decl., ¶ 12. There is, however, significant evidence that those with previous infections face greater risks of adverse reactions from the vaccines, as well as a greater rate and severity of subsequent COVID-19 infections than those with previous infections who remained unvaccinated. *See id.*, ¶ 12 & studies cited therein; *see also* ECF 1-14, McCullough Decl., ¶¶ 49-51 & studies cited therein. Thus, in his expert opinion, "COVID-19 vaccination is contraindicated in COVID-19 survivors." Ex. 5, McCullough Supp. Decl., ¶ 12.

## IV.   PLAINTIFF'S RELIGIOUS ACCOMMODATION REQUESTS

### A.      Plaintiff's Sincerely Held Religious Beliefs

45.     In his declaration and religious accommodation request attached hereto, Plaintiff has set forth the sincerely held religious beliefs that compel

him to oppose the mandate. First, he explains that "God created my body as a temple of the Holy Spirit," and I will not defile my body, the temple of the Holy Spirit, with unwanted intrusions that God has guided me not to take." Ex. 1, Crosby Decl., Attach. 4 at 2 (*citing* 1 Corinthians 6:19-20). Second, he explains that "God has told me in Revelations 13:17 that everyone must get the mark of the beast "so that no one can buy or sell unless he has the mark, that is, the name of the beast or the number of his name." It is my firmly held religious belief that these vaccines are being used to bring on the mark of the beast, if they are not the mark of the beast themselves." *Id.* Third, he explains that God tells us "we should not knowingly commit sin when God states in James 4:17 'So whoever knows the right thing to do and fails to do it, for him it is sin.' Therefore, if I believe something is harmful to my body, I am sinning if I knowingly and intentionally do it anyway." *Id.*

**B.    Defendants Have Systematically Denied Religious Accommodation Requests.**

46.    Defendants have systematically denied religious accommodation requests. The tables below, which include information taken from Defendants' compliance notice in the *Navy SEAL 1* Proceeding, *see* Ex. 6, Defendants February 4, 2022 Compliance Notice, demonstrate that the Armed Services have granted zero or nearly zero religious accommodation requests, while denying thousands. (Plaintiff includes statistics for all Armed Services to

demonstrate that there is a DoD-wide policy of uniformly denying religious accommodations that, upon information and belief, was ordered by Secretary Austin.)

**Table 1: Religious Accommodation Requests & Appeals**

| Armed Service | Initial RA Requests | | | RA Appeals | | |
|---|---|---|---|---|---|---|
| | Filed | Denied | Approved | Appeals | Denied | Approved |
| Air Force | 12,623 | 3,180 | 5 | 2,221 | 443 | 1 |
| Army | 3,523 | 391 | 0 | 55 | 0 | 0 |
| Coast Guard | 1,308 | 578 | 0 | 224 | 0 | 0 |
| Marine Corps | 3,539 | 3,458 | 0 | 1,150 | 119 | 3 |
| Navy | 4,095 | 3,728 | 0 | 1,222 | 81 | 0 |
| Total | 25,008 | 11,335 | 5 | 4,872 | 643 | 4 |

47.     Plaintiff notes the Air Force and Marine Corps purport to have granted a handful of requests and appeals. However, these RARs appear to have been granted to those on terminal leave or conditioned upon their separation from the military. *See Navy SEAL 1 v. Austin*, --- F.Supp.3d ---, 2022 WL 534459, at *19 (M.D. Fla. Feb. 18, 2022) ("*Navy SEAL 1*") (Marine Corps approvals); *Poffenbarger v. Kendall*, No. 3:22-cv-1, 2022 WL 594810, at *13 n.6 (S.D. Oh. Feb. 28, 2022) ("*Poffenbarger*") (Air Force approvals). Thus, even the exceptions to the general policy of denying them all demonstrate that the process is a sham because the result is that no service member will be granted religious accommodation and allowed to continue their service

48.     While the Armed Services have categorically denied all or nearly

all religious exemptions, they have granted thousands of medical and administrative exemptions.

**Table 2: Medical & Administrative Exemptions Granted**

| Armed Service | Medical Exemptions | | Administrative Exemptions | |
|---|---|---|---|---|
| | Permanent | Temporary | Permanent | Temporary |
| Air Force | UNKNOWN | 1,513 | 2,314 | |
| Army | 6 | 2,106 | NOT REPORTED | |
| Coast Guard | 4 | 6 | NOT REPORTED | |
| Marine Corps | 21 | 232 | 321 | 78 |
| Navy | 11 | 252 | 460 | 35 |

49. These statistics demonstrate that: (1) submission of religious accommodation requests are futile; (2) the DoD and the Army are systematically refusing to grant religious accommodations; and (3) the DoD and Army are discriminating against religious exercise by treating comparable secular activity (*i.e.*, medical and administrative exemptions) more favorably.

## V. PLAINTIFF HAS AND WILL SUFFER CONCRETE AND PARTICULARIZED HARMS

50. Plaintiff will suffer concrete and particularized harm as a result of the Secretary Austin's promulgation of an unlawful order, executed by the Army (*i.e.*, the DoD Mandate and FRAGO 5), and their unlawful and unconstitutional policy of refusing to grant religious accommodations. As a result of his refusal to follow an unlawful order to take an unlicensed, EUA vaccine, and the near certain denial of his request for religious accommodation,

Plaintiff will face adverse employment or disciplinary actions, involuntary separation or discharge, loss of veterans and government benefits, and the loss of fundamental rights. *See supra* Section I.D ("Disciplinary Consequences for Vaccine Refusal") & Ex. 1, Crosby Decl., ¶¶ 8-10 (describing counseling and other potential disciplinary actions). The injury is exacerbated by the fact that the government not only seeks to deprive Plaintiff of his informed consent rights both through deception and coercion, but also to take his freedoms and livelihood for having the temerity to exercise the rights granted to them by statute and the U.S. Constitution.

### FIRST CAUSE OF ACTION
### VIOLATION OF INFORMED CONSENT LAWS
### 10 U.S.C. § 1107a, 21 U.S.C. 360bbb-3, & 5 U.S.C. 706(2)(C)

51.    Plaintiff realleges, as if fully set forth in this Count, the facts in Paragraph 7-12, Paragraphs 21-26 (Section I: "The DoD Mandate and Army Guidance"), Paragraphs 27-39 (Section II: "FDA Emergency Use Authorization and Licensing of COVID-19 Treatments"), and Paragraph 50.

52.    It is undisputed that the FDA-licensed COVID-19 vaccines (Comirnaty and Spikevax) are not available and have not been available since the imposition of the DoD Mandate in August, 2021. *See supra* ¶¶ 34-35. In the absence of FDA-licensed vaccines Defendants are instead "mandating vaccines from EUA-labeled vials." *Austin*, 2021 WL 5816632, at *5. The Informed Consent Laws expressly prohibit the mandatory administration of EUA

25

product, whether to service members or anyone else. *See* 10 U.S.C. § 1107a and 21 U.S.C. § 360bbb-3. The statutory informed consent rights are expressly stated in the fact sheet that the FDA requires to be included in every package of EUA vaccines and that confirm that the recipient the "option to accept or refuse" the EUA product. ECF 1-13 at 13.

53.   The DoD Mandate and the Army's implementing orders and guidance violate these Informed Consent Laws to the extent that the DoD and/or the Army have mandated the unlicensed EUA Pfizer/BioNTech or Moderna vaccines, and/or direct DoD healthcare providers or military treatment facilities to administer the unlicensed EUA vaccine pursuant to the DoD Mandate. While the DoD Mandate itself states that only FDA-licensed vaccines may be mandated, *see* ECF 1-2 at 1, Defendants DoD and Army are in fact mandating EUA-labeled vaccines. *See Austin*, 2021 WL 5816632, at \*5.

54.   The DoD and the Army are departments and agencies of the United States Government. As such, they are agencies created by statute, and "it is axiomatic that an administrative agency's power to promulgate legislative regulations," like the DoD Mandate, "is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, L.Ed.2d 493 (1988); *see also La. Pub. Serv. Comm'n v. FERC*, 476 U.S. 355, 375, 106 S. Ct. 1890, 90 L.Ed.2d 369 (1986) ("an agency literally

has no power to act, …, unless and until Congress confers power on it.").

55.     While Congress and the President have delegated broad authority to the DoD and the Secretary of Defense in military matters, in 10 U.S.C. § 1107a they expressly prohibited Secretary Austin from issuing the order at issue here mandating the administration of an EUA product, without the express Presidential authorization that Secretary Austin has neither requested nor received. Accordingly, the DoD Mandate itself and Army's implementation of it are "in excess of statutory jurisdiction [and] authority." 5 U.S.C. § 706(2)(C).

56.     The Informed Consent Laws do not provide a private right of action. Accordingly, Plaintiff's claims for Defendants' *ultra vires* actions in excess of their statutory authority, and in violation of Plaintiff's rights under the Informed Consent Laws, are brought under the APA. *See, e.g., Austin*, 2021 WL 5816632, at *2 & *7 n.12 (violations of Informed Consent Laws are "APA claims"). It is well-settled that, where a statute does not provide a cause of action, plaintiffs "are nevertheless entitled to enforce [the statute's] substantive requirements through the judicial review provisions of the APA." *Int'l Brominated Solvents Ass'n v. Am. Conf. of Governmental Indus. Hygienists, Inc.,* 393 F.Supp.2d 1362, 1378 (M.D. Ga. 2005).

57.   It is further undisputed that the Pfizer/BioNTech and Moderna EUA COVID-19 vaccines are "legally distinct" from the licensed vaccines, Comirnaty and Spikevax. The EUA COVID-19 vaccines are subject to the laws governing EUA products, including the right to informed consent and to refuse mandatory administration, while Comirnaty and Spikevax are subject to the heightened safety and efficacy requirements governing FDA-licensed products, as well as the PHSA and FDA's requirements governing manufacturing and labeling of licensed products. Defendants have directed that all EUA-labeled COVID-19 vaccines by Pfizer/BioNTech or Moderna are legally interchangeable with these manufacturers' FDA-licensed vaccines (*i.e.*, Comirnaty and Spikevax), such that all EUA-labeled vaccines may be mandated. This directive erases the "legal[] distinct[ions] acknowledged by the FDA, and treats the FDA's determination that they are "medically interchangeable" as if the FDA has made a "statutory interchangeability determination," despite the fact that the FDA has expressly disclaimed having done so. *See supra* ¶ 37.

58.   Plaintiff notes that, in other legal challenges to the DOD Mandate, Defendants' counsel has asserted the affirmative defense that the DoD Mandate, and the scope of interchangeability, is limited to EUA-labeled, "BLA-compliant" vaccines (*i.e.*, vaccines manufactured in accordance with the

Comirnaty BLA). *See generally Austin*, 2021 WL 5616632, at *5-6; *see also* ECF 15 at 22-24. But the DoD Mandate and the Army order never use the terms "BLA-compliant," or suggest any such limitation, and the publicly available documents assert that any and all EUA-labeled vaccines are legally interchangeable with the licensed vaccines, without any limitation to "BLA-compliant" lots. The purported limitation of the mandate to "BLA-compliant" lots was announced in the first instance by agency defense counsel in court filings and is entirely unsupported in the record. *See generally* Ex. 3 (graphic representation of Defendants' counsels' position). Courts may not accept "post hoc rationalization by counsel as prime authority for agency decision[s]." *Harrison v. Ocean Bank*, 2011 WL 2607086, at *4 (S.D. Fla. June 30, 2011).

59.     Moreover, the DoD and Army administrative records submitted in the *Coker* proceeding, and filed separately in this proceeding confirm that: (1) all references to interchangeability in the record indicate that ***all*** unlicensed EUA-labeled COVID-19 vaccines (*i.e.*, without limitation to EUA-labeled, BLA-compliant lots) are deemed to be interchangeable with the licensed version; and (2) that there is no discussion of interchangeability with respect to "BLA-compliant" lots, nor is there any policy, directive, or guidance limiting the DoD Mandate to EUA-labeled, "BLA-compliant" lots. *See also Austin*, 2021 WL 5616632, at *6 ("the DoD concedes that … its current [EUA-

29

labeled] vials are not BLA-compliant, and that there is no policy to ensure that servicemembers get only BLA-compliant vaccines."). Accordingly, Defendants are barred by the "record rule" from asserting any defense for which there is no support in the record and that was asserted only by agency defense counsel.

60.    Nor should this Court impose any requirement for Plaintiff to plead that he specifically requested or was denied a "BLA-compliant" vaccine. Nevertheless, on at least three separate occasions, Plaintiff inquired regarding the availability of Comirnaty and/or a BLA-compliant version of the Pfizer/BioNTech vaccine at Fort Sill and MacDill AFB. *See* Ex. 1, Crosby Decl., ¶ 6. On each occasion he was informed that Comirnaty was not available, and the one time he was informed that a BLA-complaint vaccine was available, he confirmed that the lot in question was manufactured prior to the approval date and thus, as a matter of law, remained an EUA product that could not be retroactively licensed. *See id.* & *Austin*, 2021 WL 5616632, at *6.

61.    As a result of Defendants' unlawful actions, Plaintiff is required either to take an unlicensed, EUA vaccine or else face the serious disciplinary consequences outlined above that will result in the loss of his livelihood, veterans and other governmental benefits, and fundamental rights. The DoD Mandate and Army implementation must therefore be declared unlawful, and enjoined or vacated, to the extent they require the mandatory administration

of an EUA COVID-19 vaccine. *See generally John Doe #1 v Rumsfeld*, 341 F. Supp. 2d 1, 19 (D.D.C. 2004), *modified sub nom.* 2005 WL 774857 (D.D.C. 2005) (expanding injunction against mandated EUA anthrax vaccine).

**SECOND CAUSE OF ACTION**
**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
**5 U.S.C. § 706(2)(A)**

62.     Plaintiff realleges, as if fully set forth in this Count, the facts in Paragraph 7-12, Paragraphs 21-26 (Section I: "The DOD Mandate and Army Guidance"), Paragraphs 40-44 (Section III: "Safety and Efficacy Data for COVID-19 Vaccines"), and Paragraph 50.

63.     The DoD Mandate and the Armed Services' guidance must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(A). The entirety of the DOD Mandate is a two-page memorandum from the Secretary of Defense that cites no statute, regulation, executive order or other legal authority. The DoD Mandate is arbitrary and capricious insofar as it imposes an entirely new mandate on over two million active duty and reserve service members without any explanation, justification, legal basis or authority; any findings of facts or analysis (cost-benefit or otherwise) supporting the directive; any meaningful consideration of alternatives to 100% vaccination; any acknowledgement or explanation for the elimination of the currently and pre-existing exemptions for service members who have recovered from a previous documented infection; or any

31

consideration of the heightened risks and lack of any compensating benefits of vaccination for service members with documented previous infections.

64.   The DoD Mandate is arbitrary and capricious insofar as its sole justification or explanation is a conclusory statement that the Secretary has "determined that mandatory vaccination against [COVID-19] is necessary to protect the Force and defend the American people."  ECF 1-2 at 1. Given that the DoD Mandate was issued on the very next day after FDA Comirnaty Approval, it is apparent the DoD blindly relied on the FDA approval and out-of-context FDA statements regarding medical interchangeability of EUA and licensed vaccines that it erroneously interpreted as statutory or legal interchangeability.

65.   Defendants also purport to rely on the CDC's recommendations in adopting the two-dose regimen, but they have ignored the CDC's unanimous recommendation that all eligible adults should receive a third booster shot. *See* CDC, *CDC Expands Eligibility for COVID-19 Booster Shots to All Adults,* CDC Media     Statement     (Nov.     19,     2021),     available     at: https://www.cdc.gov/media/releases/2021/s1119-booster-shots.html.     Such selective picking and choosing of which recommendations to follow, without any explanation, is the essence of arbitrary and capricious decision-making.

66.    The DoD Mandate is also arbitrary and capricious because it constitutes an unannounced and unexplained departure from a prior policy. In a July 6, 2021 memorandum from the Office Legal Counsel, the DoD interpreted the informed consent requirements in 10 U.S.C. § 1107a "to mean that DoD may not require service members to take an EUA [vaccine]" without first obtaining a Presidential Waiver under 10 U.S.C. § 1107a. *See* ECF 1-23, OLC Vaccine Mandate Opinion, at 16. *See also* Ex. 1, Crosby Decl., ¶ 11 (quoting statement from DoD official that "Drugs under an EUA cannot be mandated for Service Members without an exemption from POTUS."). There has been no Presidential Waiver, yet the Defendants are mandating use of EUA vaccines that they previously and repeatedly acknowledged could only be administered on a voluntary basis. "[A]gencies must typically provide a 'detailed explanation' for contradicting a prior policy;" they may not, as DoD has done here, "depart from a prior policy *sub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S. Ct. 1800 (2009).

67.    The DoD and Army administrative records provide further confirmation that Defendants acted arbitrarily and capriciously in enacting the mandate because Defendants failed altogether to consider any alternatives to 100% vaccination, including measures that had been effectively employed over the previous 18 months prior to the mandate (*e.g.,* masking, social

distancing, testing, quarantine, etc.). Nor did Defendants provide any explanation in the record as to why these alternatives were inadequate or consider the relative costs and benefits of alternative measures. This is confirmed by the findings of the five U.S. district courts in the RFRA context that the DOD and other Armed Services failed to consider any alternative less restrictive measures. *See, e.g., Navy SEAL 1*, 2022 WL 534459, at *18; *Air Force Officer v. Austin*, 2022 WL 468799, *10 (M.D. Ga. Feb. 15, 2022) ("*Air Force Officer*"). Where an agency like DOD "provide[d] little or no explanation for the [its] choices," "omit[s] explanation for rejecting alternatives," and did "not address alternative (or supplementary) requirements," its order is arbitrary and capricious and must be vacated. *Health Freedom Def. Fund v. Biden*, 2022 WL 1134138, at *18-19 (M.D. Fla. Apr. 18, 2022).

68.    Finally, the DOD Mandate and the Army's implementation are arbitrary and capricious, insofar as Defendants categorically eliminated existing exemptions for service members like Plaintiff with a previous documented infections under AR 40-562, and failed to consider the heightened risks and lack of benefits from vaccination faced by those with natural immunity. *See supra* ¶ 44 & Ex. 5, McCullough Supp. Decl., ¶ 12. In doing so, Defendants have "entirely failed to consider an important aspect of the

problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

69.     As a result of Defendants' arbitrary and capricious actions in violation of the APA, Plaintiff will be required either to take an unlicensed vaccine, pursuant to an unlawful directive, or else face the serious disciplinary consequences outlined above that will result in the loss of his livelihood, benefits, and fundamental rights.

## THIRD CAUSE OF ACTION
## VIOLATION OF RELIGIOUS FREEDOM RESTORATION ACT
### 42 U.S.C. § 2000bbb, *et seq.*

70.     Plaintiff realleges, as if fully set forth in this Count, the facts in Paragraph 13, Paragraphs 45-49 (Section III: "Plaintiff's Religious Accommodation Request"), and Paragraph 50.

71.     RFRA was enacted "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014) ("*Burwell*"). "Congress mandated that this concept be 'construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Burwell*, 134 S. Ct. at 2762 (*quoting* 42 U.S.C. § 2000cc-3(g)).

72.     RFRA states that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). The government burdens religion when

35

it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981). "That is especially true when the government imposes a choice between one's job and one's religious belief." *U.S. Navy SEALs 1-26 v. Biden*, 2022 WL 34443, at *9 (N.D. Tex. Jan. 3, 2022) ("*Navy SEALs 1-26*").

73.     If the Government substantially burdens a person's exercise of religion, it can do so only if it "demonstrates that application of the burden ***to the person*** – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b) (emphasis added).

74.     RFRA applies to Defendants, as they constitute a "branch, department, agency, instrumentality, and official of the United States." 42 U.S.C. § 2000bb-2(1).

75.     "RFRA expressly creates a remedy in district court," *Navy SEAL 1*, 2022 WL 534459, at *13, granting a "person whose religious exercise has been burdened in violation of" RFRA to "assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the government." 42 U.S.C. § 2000bb-1(c).

76.     Plaintiff's RFRA claim is not barred by any exhaustion requirement. "RFRA includes no administrative exhaustion requirement and

36

imposes no jurisdictional threshold. No exemption, whether … express or implied, insulates the military from review in the district court." *Navy SEAL 1*, at \*13. *See also Singh v. Carter*, 168 F.Supp.3d 216, 226 (D.D.C. 2016) ("Congress nowhere inserted [into RFRA]...any exhaustion requirement, as it did, for example, in RFRA's "sister statute," the Religious Land Use and Institutionalized Persons Act of 2000[.]").

77.    Plaintiff claims also meets other requirements for ripeness. Plaintiff submitted his initial religious accommodation request nearly six months ago on November 15, 2021, and his request his still pending. DODI 1300.17 required the Army to act on his request within 95 days. *See* DODI 1300.17 at 10 & Table. Defendants may not use their violations of their own rules and regulations to deny Plaintiff access to judicial review of his RFRA and constitutional claims, particularly where, as here, the religious accommodation process is a sham with an inevitable and "pre-determined" denial of that request. *Navy SEALs 1-26*, 2022 WL 34443, at \*6.

78.    Defendants have substantially burdened Plaintiff's free exercise rights because the mandate forces Plaintiff to "decide whether to lose [his] livelihood[] or violate sincerely held religious beliefs." *Navy SEALs 1-26*, 2022 WL 34443, at \*9.

79.    Defendants' religious exemption regulation, and implementation

37

thereof, is neither neutral nor generally applicable because it treats comparable secular activity—medical and administrative exemptions—more favorably than religious exemptions. As shown in Table 1 above, *see supra* Section IV.B, out of roughly 25,000 RARs, Defendant Army has granted zero such requests (and the other Armed Services have granted zero or nearly zero). Table 2 shows that thousands of medical and administrative exemptions have been granted. *See supra* Section IV.B, Table 2.

80.     Plaintiff has presented *prima facie* evidence that Defendants have substantially burdened the exercise of religion, which triggers strict scrutiny where the government bears the burden of proving that its policies satisfy strict scrutiny. *O Centro*, 546 U.S. at 429. *See also Navy SEALs 1-26*, at *9 ("Because the mandate treats those with secular exemptions more favorably than those seeking religious exemptions, strict scrutiny is triggered."). Defendants fail to meet this high bar for either of the two prongs of the strict scrutiny analysis.

81.     While "[s]temming the spread of COVID-19 is unquestionably a compelling interest," *Cuomo*, 141 S. Ct. at 67, "its limits are finite." *Navy SEALs 1-26*, at *10. The government cannot rely on "broadly formulated interests," like "public health" or "military readiness," and must justify its decision by "scrutiniz[ing] the asserted harm of granting specific exemptions

38

to particular religious claimants." *Hobby Lobby*, 573 U.S. at 726-27.

82.    Defendants' "broadly formulated interest in national security," *Navy SEALs 1-26*, at *10, will not suffice. Nor will simply invoking "magic words" like "military readiness and health of the force." *Navy SEAL 1*, at *17 (citation and internal quotation marks omitted). Instead, Defendants must produce "record material demonstrating that the military considered both the marginal increase, if any, in the risk of contagion incurred by granting the requested exemption and the marginal detrimental effect, if any, on military readiness and the health of the force flowing from the ... denial" of the specific Plaintiff's exemption request. *Navy SEAL 1*, at *15.

83.    In any case, the COVID-19 vaccines are "obsolete" and cannot prevent infection or transmission of the Omicron variant. *See supra* ¶ 41. Mandating a vaccine that is known to be ineffective, and thus incapable of achieving the purported governmental interest, cannot satisfy either prong of strict scrutiny.

84.    Further, Plaintiff has a documented previous COVID-19 infection from which he has fully recovered. Such natural immunity from previous infections provides stronger and longer-lasting protection than the vaccines. Moreover, Plaintiff has proposed alternative mitigation measures consistent both with those that have been successfully practiced over the last two years

since COVID-19 emerged. Several courts have found that Defendants'
requirement for 100% vaccination, without consideration of the benefits of
natural immunity or other proposed alternatives for the applicant in question,
fails the least restrictive means requirement under RFRA. *See, e.g., Navy
SEAL 1*, at *18; *Navy SEALs 1-26*, at *10; *Air Force Officer*, 2022 WL 468799,
at *10.

85.    Plaintiff seeks declaratory and injunctive relief because he has no
adequate remedy at law to prevent future injury caused by Defendants'
violation of his right under RFRA to the free exercise of religion.

## FOURTH CAUSE OF ACTION
## VIOLATION OF FIRST AMENDMENT FREE EXERCISE CLAUSE
### U.S. CONST. AMEND. I

86.    Plaintiff realleges, as if fully set forth in this Count, the facts in
Paragraph 13, Paragraphs 45-49 (Section III: "Plaintiff's Religious
Accommodation Request"), and Paragraph 50.

87.    The First Amendment's Free Exercise Clause provides that
"Congress shall make no law respecting an establishment of religion or
prohibiting the free exercise thereof." U.S. CONST. AMEND. I.

88.    "Government is not free to disregard the First Amendment in
times of crisis." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63,
69 (2020) ("*Cuomo*") (Gorsuch, J., concurring). "Even in a pandemic, the
Constitution cannot be put away and forgotten." *Cuomo*, 141 S. Ct. at 68 (per

40

curiam). Just as "[t]here is no COVID-19 exception to the First Amendment," there is "no military exclusion from our Constitution." *Navy SEALs 1-26*, at \*1

89.   Governmental regulations that are not neutral or generally applicable "trigger strict scrutiny" when "they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original) (*citing Cuomo*, 141 S. Ct. at 67-68). "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877 (2021).

90.   Plaintiff's claim is ripe. Plaintiff submitted a religious exemption request, stating that his religious beliefs prohibit him from receiving the available COVID-19 vaccines because of his sincerely held religious beliefs. Defendant Army was required to act on that request within 95 days, but has not taken any action after nearly six months. Defendants should not be permitted to block Plaintiff's access to judicial review through indefinitely delaying action on his request, in violation of their own rules, especially where as here, the outcome (denial) is pre-determined.

91.   Defendants' rules and policies governing religious accommodations—uniformly denying and granting zero exemptions (or close

enough to zero to amount to a rounding error—are neither neutral nor generally applicable because they "single out … for harsh[er] treatment," *Cuomo*, 141 S. Ct. at 66, those who choose to remain unvaccinated for religious reasons than those who seek to remain vaccinated for secular treatment. The numbers in Table 1 and Table 2, *see supra* Section IV.B, speak for themselves, with thousands of medical and administrative exemptions granted, compared to a mere handful of religious accommodations for service members who will not remain in the service.

92.     Having established that Defendants' policies are not neutral and substantially burden Plaintiff's exercise of religion by treating those seeking exemption from vaccination less favorably than those seeking exemption for secular reasons, the burden of proof switches to Defendants who must demonstrate that their policies satisfy strict scrutiny, meaning that they must be (1) "narrowly tailored" (2) "to serve a compelling [government] interest." *Cuomo*, 141 S. Ct. at 67 (*citing Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)).

93.     Defendants' religious exemption policies fail to satisfy strict scrutiny under the First Amendment for largely the same reasons they fail strict scrutiny under RFRA. The DOD Mandate, as a policy and as applied to Plaintiff, fails to accommodate Plaintiff's sincerely held religious beliefs. There

is no interest, compelling or otherwise, for Defendants' refusal to grant Plaintiff's religious exemptions or threaten not to accommodate Plaintiff's sincerely held religious beliefs. Nor have Defendants chosen the least restrictive means of achieving any compelling governmental interest. Accordingly, the DOD Mandate, and the Defendants' religious accommodation policies and procedures, cannot survive strict scrutiny.

94.    Plaintiff seeks declaratory and injunctive relief because he has no adequate remedy at law to prevent future injury caused by Defendants' violation of his First Amendment right to the free exercise of religion.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff respectfully asks this Court to:

A. Declare the DoD Mandate and implementing orders to be unlawful, *ultra vires* actions, and to vacate these orders to the extent that these orders mandate administration of an unlicensed EUA vaccine;

B. Enjoin the implementation or enforcement of the DOD Mandate by the Defendants with respect to the Plaintiff;

C. Declare that the Defendants' religious exemption process violates services members' rights under RFRA, the First Amendment Free Exercise Clause, and the Fifth Amendment Due Process Clause, and that Defendants' religious exemption processes fails to satisfy strict scrutiny; and

D. Enjoin any adverse or retaliatory action against the Plaintiff as a result of, arising from, or in conjunction with the Plaintiff's RAR requests or denials, or for pursuing this action, or any other action for relief from Defendants' constitutional, statutory, or regulatory violations.

Respectfully submitted,

*/s/ Brandon Johnson*
DC Bar No. 491370
*/s/ Travis Miller*
TX Bar No. 24072952
Defending the Republic
2911 Turtle Creek Blvd., Suite 300
Dallas, TX 75219
Tel. (214) 707-1775
Email: bcj@defendingtherepublic.org
Email: twm@defendingtherepublic.org

44

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have on this day e-filed the foregoing First Amended Complaint for Declaratory and Injunctive Relief using the CM/ECF system.

This 18th day of May, 2022.

Respectfully Submitted,


*/s/ Brandon Johnson*
Brandon Johnson